*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JORDAN WILLIAM ALEXANDER,

        Defendant-Appellant.

UNPUBLISHED
March 11, 2021

No. 349053
Genesee Circuit Court
LC No. 17-042364-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ZICARY LAMAR CARPENTER,

        Defendant-Appellant.

No. 349055
Genesee Circuit Court
LC No. 17-042372-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSHUA JEREMIAH EUBANKS,

        Defendant-Appellant.

No. 349056
Genesee Circuit Court
LC No. 17-042366-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

-1-

v                                                          No.  349158
                                                           Genesee Circuit Court
TYLER JAMEIL PAGEL,                                        LC No.  17-042369-FC

                   Defendant-Appellant.

_____

Before:  BOONSTRA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

         Defendants Jordan Alexander, Zicary Carpenter, Joshua Eubanks, and Tyler Pagel were tried jointly, before a single jury, on charges arising from a home invasion in Flint, during which one occupant was assaulted and another killed.  The jury convicted Alexander of first-degree felony murder, MCL 750.316(1)(b), first-degree home invasion, MCL 750.110a(2), conspiracy to commit first-degree home invasion, MCL 750.157a and MCL 750.110a(2), assault with intent to rob while armed, MCL 750.89, armed robbery, MCL 750.529, and five counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1).  The jury convicted Carpenter of first-degree home invasion, conspiracy to commit first-degree home invasion, armed robbery, and three counts of felony-firearm.  Finally, the jury convicted Eubanks of only first-degree home invasion and conspiracy to commit first-degree home invasion, and it convicted Pagel of first-degree home invasion, conspiracy to commit first-degree home invasion, and armed robbery.

         The trial court sentenced Alexander to life imprisonment without parole for the first-degree murder conviction, and prison terms of 158 to 240 months each for the home invasion and conspiracy to commit home invasion convictions, 380 to 720 months each for the assault with intent to rob and armed robbery convictions, and two years for each felony-firearm conviction. The court ordered that Alexander's sentences for felony murder, home invasion, conspiracy to commit home invasion, assault with intent to rob, and armed robbery were to "run consecutive of each other" and consecutive to the five felony-firearm sentences, which were to "run concurrent with each other."  Alexander appeals as of right in Docket No. 349053.  For the reasons set forth in this opinion, we affirm Alexander's convictions but remand for further sentencing proceedings consistent with this opinion.

         The trial court sentenced Carpenter to prison terms of 158 to 240 months each for the home invasion and conspiracy to commit home invasion convictions, 380 to 720 months for the armed robbery conviction, and two years for each felony-firearm conviction.  The court ordered the sentences for home invasion, conspiracy to commit home invasion, and armed robbery to be served "consecutive with each other" and consecutive to the three felony-firearm sentences, which were to "run concurrent with each other."  Carpenter appeals as of right in Docket No. 349055.  For the reasons set forth in this opinion, we affirm Carpenter's convictions but remand for further sentencing proceedings consistent with this opinion.

         The trial court sentenced Eubanks to prison terms of 140 to 240 months each for the home invasion and conspiracy to commit home invasion convictions, to be served consecutively. Eubanks appeals as of right in Docket No. 349056.  For the reasons set forth in this opinion, we

affirm Eubanks's convictions but remand for further sentencing proceedings consistent with this opinion.

Finally, the trial court sentenced Pagel to prison terms of 140 to 240 months each for the home invasion and conspiracy to commit home invasion convictions, and 300 to 700 months for the armed robbery conviction, with "all counts to run consecutive with each other." Pagel appeals as of right in Docket No. 349158. For the reasons set forth in this opinion, we affirm Pagel's convictions but remand for further sentencing proceedings consistent with this opinion.

## I. BACKGROUND

Defendants' convictions arise from a home invasion at the home of Albert and Janice Ballard in Flint during the early morning hours of July 11, 2017. Janice was physically assaulted and Albert was shot and killed during the offense. The prosecutor's theory at trial was that all four defendants, and a fifth person, Dreshavon Jones, planned and participated in the home invasion. Jones pleaded guilty to several charges pursuant to a plea agreement that required him to testify truthfully at defendants' trial. According to Jones, he and the other defendants committed a home invasion at a different home, belonging to Austin Papkey, earlier in the night and then targeted the Ballard home. Evidence of the Papkey home invasion was introduced at defendants' trial. Jones testified that when the group entered the Ballard home, Carpenter gave him a .40-caliber firearm, which Carpenter said was not loaded, and Alexander was holding a nine-millimeter firearm and wearing a red hooded sweatshirt.

Janice Ballard testified that she awoke to find an intruder wearing a red hooded sweatshirt inside her bedroom. The intruder demanded to know where she kept her money. When Janice did not immediately respond, the intruder hit her. Albert was downstairs, where he had apparently fallen asleep while watching television. According to Janice, Albert owned a .45-caliber firearm that he kept in one of the kitchen cupboards. While Janice was upstairs in her bedroom, she heard voices coming from downstairs saying, "he's got a gun." The intruder in Janice's room then left the room and Janice heard an exchange of gunfire coming from downstairs. She then saw Albert coming up the stairs holding his firearm, followed by the sound of breaking glass, and then additional gunfire. Albert was shot during the offense and died from his injuries.

Jones testified that after the shooting erupted, he, Alexander, and Eubanks all jumped out a bedroom window to escape from the house and then fled on foot, climbing a fence and discarding some clothing and other items along the way. Shortly after the offense, Carpenter and Pagel were involved in a car accident at an intersection approximately half a mile from the crime scene when their car, which was being driven without headlights, collided with another vehicle. When the police responded to the accident scene, Carpenter and Pagel were still present and the police discovered that Carpenter had a gunshot wound. A wallet belonging to Austin Papkey, the victim of the earlier home invasion that night, was found in Carpenter's clothing. Nine-millimeter ammunition, with hollow points, was found inside the car. The car was registered to Alexander, whose identification was also found inside the car.

The police recovered video footage capturing Alexander, Eubanks, and Jones at different locations near the crime scene shortly after the offense. The prosecution also presented evidence that on the morning after the offense, Alexander, Eubanks, and Jones made statements to various

-3-

individuals implicating themselves and others in the offense. Evidence of cell phone mapping technology also placed defendants near the crime scene at the time of the offense. In addition, several items associated with the crime were submitted for DNA testing, and DNA consistent with each defendant's DNA profile was found on different items. In particular, a red shirt found in an alley close to the Ballard home contained DNA consistent with Alexander's DNA profile, and a black hoodie found in some bushes near the Ballard home contained DNA consistent with Eubanks's DNA profile.

The police did not recover any weapons other than Albert's .45-caliber firearm that was found at the scene, but the police recovered both spent and live ammunition from the Ballard home that was consistent with two different weapons—a nine-millimeter firearm and Albert's .45-caliber firearm. Bullet fragments recovered from Albert's body contained hollow points that were consistent with the nine-millimeter ammunition found in the car that Carpenter and Pagel were driving at the time of their accident. The police found a receipt inside the car that indicated that the ammunition was purchased from a Dunham's store on July 1, 2017. The police obtained video footage from the Dunham's store that showed Carpenter and Alexander purchasing the ammunition.

All four defendants were charged with first-degree felony murder, first-degree home invasion, conspiracy to commit first-degree home invasion, armed robbery, assault with intent to rob while armed, and several counts of felony-firearm. The jury found Alexander guilty of all counts as charged. The jury acquitted Carpenter of felony-murder and assault with intent to rob while armed, as well as the felony-firearm counts associated with those offenses, but found him guilty of first-degree home invasion, conspiracy to commit first-degree home invasion, armed robbery, and the felony-firearm charges associated with those three counts. The jury found defendants Eubanks and Pagel guilty of first-degree home invasion and conspiracy to commit first-degree home invasion, and also found Pagel guilty of armed robbery, but acquitted those defendants of all other charges, including all counts of felony-firearm. All four defendants now appeal their convictions and sentences as of right. This Court has consolidated the appeals.[1]

## II. SPEEDY TRIAL

Alexander argues that he was denied his right to a speedy trial. The question whether a defendant was denied the right to a speedy trial presents an issue of constitutional law, which this Court reviews de novo. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). However, to preserve a speedy trial issue, a defendant is required to "make a 'formal demand on the record' " for a speedy trial. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Alexander argues that he asserted his right to a speedy trial at a March 9, 2018 hearing when his defense counsel asserted, "We're ready for trial, Judge." This assertion was made within the context of a discussion on the record involving the trial court, the prosecutor, and the attorneys representing each of the defendants. The discussion concerned the status of discovery and whether the cases would be consolidated for trial. Approximately one year passed until the trial started on March 6, 2019, which was almost 20 months after Alexander had been arrested on July 12, 2017. Nonetheless,

---

[1] *People v Alexander*, unpublished order of the Court of Appeals, entered September 22, 2020 (Docket Nos. 349053, 349055, 349056, 349158).

Alexander does not claim that he ever made a demand for a speedy trial or to go to trial, nor does he claim to have otherwise contended that his right to a speedy trial was being violated during that time. Instead, Alexander solely relies on the above referenced assertion that he was ready for trial and his argument on appeal that there is no preservation requirement for the right to a speedy trial.

As will be explained below, Alexander is legally incorrect with respect to issue preservation and the right to a speedy trial. Furthermore, we conclude that the mere statement, "We're ready for trial," without any reference to the right to a speedy trial or a demand for trial to begin is not a formal demand for a speedy trial. Alexander therefore has failed to preserve this issue for appeal. *Id.*

The federal and state constitutions, as well as Michigan statutory law, protect a defendant's right to a speedy trial. *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013); see also US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1. This Court reviews unpreserved claims of error, whether of constitutional or nonconstitutional magnitude, for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." [*Id.* at 763-764 (citations omitted; alteration in original).]

We acknowledge that a defendant's failure to assert the right to a speedy trial does not *waive* appellate review of the issue. *People v Collins*, 388 Mich 680, 692-693; 202 NW2d 769 (1972). While Alexander apparently believes that this means there is no need to preserve a speedy trial claim, our Supreme Court has explained that there is a difference between waiver and forfeiture, with a waiver being "defined as the intentional relinquishment or abandonment of a known right" and forfeiture being defined as "the failure to make the timely assertion of a right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citations omitted). In this case, Alexander failed to timely assert his right to a speedy trial by failing to raise it in the trial court and thereby forfeited this right, making plain-error review applicable on appeal. *Id.* at 215-216; *Carines*, 460 Mich at 763-764. "Michigan has long recognized the importance of preserving issues for appellate review." *Carines*, 460 Mich at 762.

"In determining whether a defendant has been denied the right to a speedy trial, we balance the following four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Williams*, 475 Mich at 261-262 (setting forth what are commonly referred to as the *Barker* factors from *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972)). "Following a delay of eighteen months or more,

prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Williams*, 475 Mich at 262. "Under the *Barker* test, a presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id.* (quotation marks and citation omitted).

In this case, however, Alexander has the burden on plain-error review of this unpreserved claim of error to demonstrate that the approximately 20-month delay between the time of his arrest and trial caused him prejudice by affecting the outcome of the lower court proceedings. *Carines*, 460 Mich at 763. Nonetheless, beyond claiming that he suffered personally from the stress and anxiety of being incarcerated for 20 months before his trial commenced, Alexander does not offer any evidence or explanation to show how the outcome of the lower court proceedings was affected, or how he was otherwise prejudiced, by the delay.

In *Williams*, 475 Mich at 264, our Supreme Court recognized that the defendant "suffered considerable personal deprivation" by being incarcerated for 19 months before trial, but noted that an even longer pretrial delay during which an individual is incarcerated can still weigh against a defendant "if his defense is not prejudiced by the delay." The Court held that the more important consideration is whether the defendant's ability to mount a defense was prejudiced, because a defendant's inability to adequately present his case undermines the fairness of the justice system. *Id.*

In this case, Alexander does not explain how his ability to defend against the charges was undermined by the delay, and the record does not otherwise support a finding of any prejudice to Alexander's defense. Alexander does not claim that any evidence was lost, explain how his ability to effectively cross-examine witnesses was hindered, or otherwise indicate how he was unable to present evidence that could have supported his defense. See *Williams*, *id.* at 264 (concluding that the trial court did not clearly err by determining that the defendant had not suffered prejudice to his defense, particularly because "the record contains no specific proof of such prejudice"). Under the circumstances presented in this case, Alexander's mere reliance on the presumed prejudice arising from a delay only slightly greater than the 18-month threshold, without more, is insufficient to satisfy his burden on plain-error review to show that he was prejudiced.[2]

Moreover, even were we to assume that Alexander had established plain error and the requisite prejudice, we still would not exercise our discretion to reverse Alexander's convictions because he has not provided any evidence or explanation to establish that "the plain, forfeited error resulted in the conviction of an actually innocent defendant or . . . seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763-764 (quotation marks and citation omitted; alteration in original). Accordingly, Alexander is not entitled to relief on this issue.

### III. OTHER-ACTS EVIDENCE

---

[2] In this context, we also deny Alexander's request for an evidentiary hearing, which he has requested without any offer of proof regarding what evidence such a hearing would bring to light.

Alexander, Carpenter, and Eubanks all argue that the trial court abused its discretion by admitting other-acts evidence that defendants committed another home invasion at the home of Austin Papkey shortly before the home invasion at the Ballard home.

We review a trial court's ultimate decision regarding the admissibility of evidence for an abuse of discretion, but we review any underlying questions of law de novo. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). A trial court abuses its discretion if its "decision is outside the range of principled outcomes." *Id.*

Before trial, the trial court granted the prosecutor's motion in limine to admit evidence of the Papkey home invasion under MRE 404(b)(1) for its relevance to the issues of defendants' identity, intent, motive, and to show that the Ballard home invasion was part of a common scheme or plan.

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People* v *Denson*, 500 Mich 385, 397; 902 NW2d 306 (2018), our Supreme Court recognized that the first sentence of MRE 404(b)(1) reflects the "deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." However, "[t]he second sentence of MRE 404(b)(1) establishes that other-acts evidence may be admissible for other nonpropensity purposes." *Denson*, 500 Mich at 398. Admissibility of evidence under MRE 404(b)(1) is governed by the following standard:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*Denson*, 500 Mich at 398, quoting *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).]

In this case, the prosecution sought to admit the evidence of the Papkey home invasion for purposes of showing identity, intent, and a common scheme or plan. The trial court ruled that the evidence was admissible for these purposes. These purposes are among the enumerated noncharacter purposes for which evidence may be admissible under MRE 404(b)(1).

However, the "mechanical recitation of a permissible purpose, without explaining how the evidence relates to the recited purpose[ ], is insufficient to justify admission under MRE 404(b)." *Denson*, 500 Mich at 400 (quotation marks and citation omitted; alteration in original). "Rather, in order to determine whether an articulated purpose is, in fact, merely a front for the improper admission of other-acts evidence, the trial court must closely scrutinize the logical relevance of the

evidence under the second prong of the *VanderVliet* test." *Id*. Logical relevance is a pivotal determination in weighing the admissibility of other-acts evidence. *Id*. at 401.

To be logically relevant, evidence must be not only material, but also have probative value. *Id*. Other-acts evidence is material if it is related to a fact of consequence in the case, and the pertinent inquiry is whether the fact that the evidence seeks to establish is really at issue. *Id*. "Evidence is probative if it tends 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id*. at 401-402, quoting MRE 401. For other-acts evidence to have probative value "it truly must be probative of something *other* than the defendant's propensity to commit the crime." *Denson*, 500 Mich at 402 (quotation marks omitted).

A court must examine the similarity between the other-acts evidence and the charged offenses to determine whether the prosecution "has provided an intermediate inference other than an impermissible character inference[.]" *Id*. With regard to the degree of similarity required between the uncharged act and the charged offense, this will "depend[ ] on the manner in which the prosecution intends to use the other-acts evidence." *Id*. at 402-403. The Court in *Denson* emphasized that if the prosecution relies on the similarity between the other-acts evidence and the charged offenses to establish a theory of relevance, there must be a "striking similarity" for the other-acts evidence to be admissible. *Id*. at 403 (quotation marks and citation omitted). "When the prosecution's theory of relevancy is not based on the similarity between the other act and the charged offense, a 'striking similarity' between the acts is not required." *Id*. (citation omitted).

In the present case, the identity of the assailants who entered the Ballard home was a disputed issue at trial. Alexander, in particular, mounted a defense theory that he was not present during the Ballard home invasion. Janice identified one of her assailants as wearing a red hoodie and Papkey testified that one of his assailants was wearing red. Jones testified that he and the other four defendants all participated in both home invasions and that Alexander was wearing a red hooded sweatshirt. Property taken from the Papkey home invasion was found inside the car that Carpenter and Pagel were driving when they were involved in an accident shortly after the Ballard home invasion. A red hooded sweatshirt was found outside near the Ballard home and DNA on this sweatshirt was consistent with Alexander's DNA profile. Papkey's and Janice's testimony both identifying one of the assailants as wearing red, together with the evidence linking defendants to the Papkey home invasion and the DNA evidence on the red hooded sweatshirt found near the Ballard home, contributed to identifying Alexander as a participant in the Ballard home invasion. "The prosecution bears the burden of proving every element of a charged offense beyond a reasonable doubt," *Denson*, 500 Mich at 401, and "identity is an element of every offense" *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

The motive and intent of the assailants in entering the Ballard home also was at issue. It was the prosecution's theory that the assailants entered the Ballard home without permission, for the purpose of stealing property, but on cross-examination defendants explored whether Albert may have permitted the assailants to enter the home. The evidence that defendants threatened Papkey, entered his home without his consent, and stole his property just two hours before entering the Ballard home was relevant to show that defendants likewise forcibly entered the Ballard home without consent and with the motive and intent to steal the Ballards' property. See *Yost*, 278 Mich App at 406 ("Evidence of other crimes, wrongs, or acts may be offered to prove motive. MRE

-8-

404(b)(1). Motive is the [c]ause or reason that moves the will and induces action. An inducement, or that which leads or tempts the mind to indulge a criminal act.") (quotation marks and some citations omitted; alteration in original). The prosecution was required to show that when defendants entered the Ballards' home, defendants intended to commit a felony (armed robbery or assault with intent to rob while armed in this case) while inside. MCL 750.110a(2).

The prosecution also sought to introduce the other-acts evidence to establish that defendants committed the Ballard home invasions as part of a common plan or scheme in committing home invasions. "Other-acts evidence may be admissible when the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *People v Felton*, 326 Mich App 412, 426; 928 NW2d 307 (2018) (quotation marks and citation omitted). "Mere similarity between the other-acts evidence and the charged conduct is not sufficient; rather, the effort is to establish a definite prior design or system which included the doing of the act charged as part of its consummation." *Id*. (quotation marks and citation omitted). To show a common plan, scheme, or system, the evidence of the other act and the charged offense must carry "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *People v Sabin (After Remand)*, 463 Mich 43, 64-65; 614 NW2d 888 (2000) (quotation marks, citation, and emphasis omitted).

In this case, the similarities between the evidence of the Papkey home invasion and the charged offenses related to the Ballard home invasion demonstrated that defendants were engaged that night in a common plan or scheme of seeking and taking opportunities to enter homes in the local area without permission for purposes of stealing flat screen televisions and other items of value, as well as employing firearms to threaten and assault the occupants. The evidence showed that both home invasions were committed within hours of each other, in the same geographic area, and by the same group of men who were carrying more than one firearm. When defendants confronted Papkey outside his home, they inquired about flat-screen televisions. Defendants forced Papkey at gunpoint to let them into the home, after which defendants fanned out in search of televisions and other items of value, including computers. Similarly, during the Ballard home invasion, after the group of men entered Ballards' home, they separated and searched for items of value throughout the house. One of the items defendants attempted to remove from the Ballards' home was a flat-screen television. Guns were also used during the Ballard home invasion, and Albert was shot to death. The common features between the two home invasions, both committed during the same night, can naturally be explained as individual manifestations of defendants' general plan to commit home invasions and armed robberies that night by locating vulnerable residences with items of value that could be stolen and using guns to intimidate the occupants. *Id*.

We additionally note that contrary to Alexander's argument on appeal, the existence of a common plan or scheme was related to a fact of consequence to the action, considering the conspiracy charges and the prosecution's reliance on an aiding and abetting theory with respect to the multiple defendants and charged crimes. See *People v Seewald*, 499 Mich 111, 117-118; 879 NW2d 237 (2016) (explaining that Michigan's conspiracy statute, like the common law, makes it a crime for two or more persons to reach "an understanding or agreement to accomplish an unlawful end, or a lawful end by unlawful means"); *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (stating that the three elements necessary to sustain a conviction under an aiding and abetting theory are that "(1) the crime charged was committed by the defendant or some other

-9-

person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement") (quotation marks and citation omitted).

Accordingly, the evidence of the Papkey home invasion was relevant to proper nonpropensity purposes under MRE 404(b)(1). *Denson*, 500 Mich at 398, 400-403.

With regard to the third factor, the trial court found that the probative value of the Papkey home invasion was not substantially outweighed by an unfairly prejudicial effect under MRE 403.[3] In *Sabin* (*After Remand*), 463 Mich at 71, quoting *VanderVliet*, 444 Mich at 81, our Supreme Court stated that the determination whether evidence should be excluded under MRE 403 is best reserved to the trial court, which has the ability to perform " 'a contemporaneous assessment of the presentation, credibility, and effect of testimony.' " "All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id.* at 614.

In the present case, the temporal and geographic similarities between the Papkey and Ballard home invasions and the other similarities between the two offenses heightened the probative value of the evidence with regard to identity, motive, intent, and a common scheme or plan by the participants. We are not persuaded that the trial court abused its discretion by determining that the probative value of the other-acts evidence would not be "*substantially* outweighed by the danger of *unfair* prejudice." MRE 403 (emphasis added).[4] Moreover, the risk of unfair prejudice was diminished by the trial court's limiting instructions to the jury regarding the purposes for which the evidence could be considered and specifically instructing the jury that it could not convict defendants of the charged offenses based on deciding that the other-acts evidence showed a defendant to be a "bad person," someone likely to commit crimes, or someone

---

[3] MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[4] Carpenter argues that his conviction of armed robbery demonstrates that the jury was confused by the other-acts evidence and likely relied on the evidence of the Papkey home invasion to find him guilty of armed robbery, particularly because the evidence indicated that he was not armed during the Ballard home invasion but was armed during the Papkey home invasion. However, this argument ignores that the prosecution pursued an aiding or abetting theory at trial. Although Jones testified that he and Alexander were the only two participants who were armed with a firearm at the Ballard home, he stated that it was Carpenter who handed him the 40-caliber firearm as the group entered the home. Thus, Carpenter's argument does not establish that the trial court abused its discretion by declining to exclude the other-acts evidence pursuant to MRE 403.

"guilty of other bad conduct." *Denson*, 500 Mich at 398. The trial court did not abuse its discretion by admitting the other-acts evidence of the Papkey home invasion under MRE 404(b)(1).

Alexander, Eubanks, and Carpenter also argue that the admission of this evidence violated their constitutional right to due process. Because defendants did not object on this basis in the trial court, their constitutional argument is unpreserved. *People v Brown*, 326 Mich App 185, 191-192; 926 NW2d 879 (2018). Accordingly, review of this constitutional claim is limited to plain error affecting their substantial rights. *Carines*, 460 Mich at 763-764.

Defendants' constitutional arguments are premised on their respective contentions that the other-acts evidence was inadmissible. However, as explained above, defendants failed to demonstrate that this evidence was inadmissible. Thus, defendants have not established that a plain constitutional error occurred either. *Id*. Accordingly. Alexander, Carpenter and Eubanks are not entitled to relief on this issue.

## IV. CODEFENDANTS' OUT-OF-COURT STATEMENTS

Alexander, Pagel, and Carpenter raise challenges based on the admission of out-of-court statements by their codefendants that were permitted to be considered as evidence against all of the codefendants.

Specifically, Alexander argues that the trial court abused its discretion by admitting the out-of-court statements by Eubanks about the Ballard home invasion that were admitted at trial through the testimony of Eubanks's brother, Caleb Sutton. These out-of-court statements also implicated Alexander in the criminal activity. Alexander maintains that the trial court improperly admitted these statements as statements against interest under MRE 804(b)(3) because the statements only tended to show that Eubanks was merely present during the crime.

Similarly, Pagel argues that the trial court abused its discretion by admitting Eubanks's statements through Sutton, as well as out-of-court statements by Alexander that were admitted through Sutton and through Alexander's girlfriend, Ashley Welsch. According to Pagel, these codefendants' out-of-court statements did not satisfy the requirements set forth by our Supreme Court for permitting an out-of-court statement admitted under MRE 804(b)(3) to be used as substantive evidence against a person other than the declarant.

Carpenter argues that the trial court abused its discretion by ruling that any out-of-court statement by any codefendant was admissible as substantive evidence against all defendants as admissions by party opponents under MRE 801(d)(2)(A). Alexander makes a similar argument

under MRE 801(d)(2)(E).

We review a trial court's ultimate decision regarding the admissibility of evidence for an abuse of discretion, but we review any underlying questions of law de novo. *Duenaz*, 306 Mich App at 90. A trial court abuses its discretion if its "decision is outside the range of principled outcomes." *Id*.

We first address the admissibility of Alexander's and Eubanks's out-of-court statements under MRE 804(b)(3).

MRE 801(c) provides that hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible except as provided by the rules of evidence. MRE 802. However, MRE 804(b)(3) provides that the prohibition against hearsay does not apply to the following statements made by an unavailable declarant:[5]

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

"The premise underlying this hearsay exception is the common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words." *People v Kowalski*, 492 Mich 106, 128; 821 NW2d 14 (2012) (opinion by MARY BETH KELLY, J.) (quotation marks and citation omitted). In *People v Taylor*, 482 Mich 368, 374, 377-378; 759 NW2d 361 (2008), our Supreme Court held that the admissibility of nontestimonial, out-of-court statements by a codefendant alleged to be against the declarant's penal interest is to be determined solely under MRE 804(b)(3). "While nontestimonial statements are subject to traditional rules limiting the admissibility of hearsay, they do not implicate the Confrontation Clause." *Taylor*, 482 Mich at 377, citing *Davis v Washington*, 547 US 813, 821; 126 S Ct 2266; 165 L Ed 2d 224 (2006). Our Supreme Court in *Taylor* also stated the rule directly relevant to the factual circumstances presented in the instant case as follows:

> "[W]here, as here, the declarant's inculpation of an accomplice is made in the context of a narrative of events, at the declarant's initiative without any prompting or inquiry, that as a whole is clearly against the declarant's penal interest and as such is reliable, the whole statement—including portions that inculpate another—is admissible as substantive evidence at trial pursuant to MRE 804(b)(3)." [*Taylor*, 482 Mich at 379 (alteration in original), quoting *People v Poole*, 444 Mich 151, 161; 506 NW2d 505 (1993).]

The *Taylor* Court thus reaffirmed the analysis in *Poole* with respect to MRE 804(b)(3). *Taylor*, 482 Mich at 378. However, the *Taylor* Court held that "the holding in *Poole* that a codefendant's nontestimonial statement is governed by *both* MRE 804(b)(3) and the Confrontation Clause is no longer good law." *Taylor*, 482 Mich at 378.

---

[5] Unavailability is not contested, and therefore is not at issue, on appeal.

Here, Alexander argues that Eubanks's out-of-court statements inculpating Alexander were not against Eubanks's penal interest,[6] and thus did not satisfy the requirements of MRE 804(b)(3), because Eubanks's recitation of the events showed that he was merely present during the home invasion.

The language in MRE 804(b)(3) "includes a broad scope of inculpatory statements." *Barrera*, 451 Mich at 270. "[A] particular piece of evidence need not by itself prove the declarant guilty," and "[t]he proffered statement need only be 'a brick in the wall' of proving the declarant's guilt." *Id*. at 270-271. The prosecution's theory at trial in the present case was that all four defendants were guilty of the charged offenses, either as principals or under a theory of aiding or abetting. To convict a defendant under an aiding and abetting theory, the prosecution must establish:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Robinson*, 475 Mich at 6 (quotation marks and citation omitted).]

As Alexander points out, "[m]ere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime." *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999). Contrary to what Alexander argues, however, the pertinent events of the Ballard home invasion as recounted by Eubanks to Sutton did not simply indicate that Eubanks was an uninvolved person who was merely present during the Ballard home. In his conversation with Sutton, Eubanks related how he entered the Ballard home without permission with the other codefendants and Jones, while at least one of them was armed with a gun, and came upon an older gentleman sitting on the couch. Eubanks indicated that he and Alexander went upstairs where he heard a woman crying and Alexander pistol-whipped the woman. Eubanks further stated that he heard gun shots, hid under a bed, and then fled from the scene by jumping out a bedroom window.

As a whole, Eubanks's statements indicated that he had willingly participated with codefendants, some of whom were armed, in breaking into a residential home, spreading out throughout the home, threatening the occupants of the home, and then escaping by jumping out a window after gunfire erupted. Eubanks's statements support, at a minimum, an inference that he gave assistance and encouragement. We conclude that Eubanks's statements as a whole, "tended to subject [him] to . . . criminal liability," and therefore, were admissible under MRE 804(b)(3). *Barrera*, 451 Mich at 270-271; *Robinson*, 475 Mich at 6.

Next, Pagel's argument that the out-of-court statements by Eubanks and Alexander were inadmissible is incorrectly premised entirely on the factors set forth in *Poole* for analyzing whether

---

[6] The "determination whether a statement was against the declarant's penal interest" is a question of law that is reviewed de novo. *People v Barrera*, 451 Mich 261, 268; 547 NW2d 280 (1996) (quotation marks and citation omitted).

-13-

the Confrontation Clause was violated. Our Supreme Court in *Taylor* specifically overruled this portion of *Poole* and held that nontestimonial hearsay statements by codefendants are subject to MRE 804(b)(3) but do not implicate the Confrontation Clause. *Taylor*, 482 Mich at 374. Pagel concedes that the statements at issue made by Eubanks and Alexander to Sutton and Welsch (Eubanks's brother and Alexander's girlfriend, respectively) were not testimonial. See *Taylor*, 482 Mich at 377-378 (explaining that testimonial statements generally are those made during court or grand jury proceedings or police interrogations that have the primary purpose of establishing past events potentially relevant to criminal prosecution). Thus, Pagel has failed to demonstrate error by the trial court in admitting these out-of-court statements under MRE 804(b)(3).

Next, Carpenter argues that the trial court abused its discretion by ruling that any out-of-court statement by any codefendant was admissible as substantive evidence against all defendants as admissions by party opponents under MRE 801(d)(2)(A). However, Carpenter acknowledges the trial court's rulings that various codefendants' statements were admissible under MRE 804(b)(3) as substantive evidence against codefendants other than the declarants. Carpenter does not argue that the trial court erred under MRE 804(b)(3) other than asserting that this Court should somehow overturn the ruling of our Supreme Court in *Taylor*. Instead, Carpenter raises a litany of complaints about how he believes he was unfairly prejudiced by various testimony but without cogently explaining how the admission of that testimony was erroneous. In sum, Carpenter does not explain how any of the out-of-court statements by his codefendants were inadmissible under MRE 804(b)(3). Accordingly, Carpenter has failed to demonstrate any error premised on the admission of these statements. Moreover, he has also abandoned his appellate arguments regarding the out-of-court statements by failing to properly and coherently present them to this Court. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009) (quotation marks and citation omitted). We are unable to discern from Carpenter's presentation of this issue in his brief any understandable basis for granting him relief.

Next, Alexander additionally argues that the trial court abused its discretion by admitting "several statements of the codefendants" under MRE 801(d)(2)(E), which provides that a statement is not hearsay if it is "offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy." However, Alexander ignores that in both of the instances he cites, MRE 804(b)(3) was also asserted as a basis for justifying the admission of the statements. Assuming without deciding that the statements were inadmissible under MRE 801(d)(2)(E), Alexander has failed to offer any argument that the statements were not admissible under the alternatively offered basis. Thus, Alexander has not shown that the trial court abused its discretion by admitting these statements and has abandoned any further challenge to their admissibility. *Waclawski*, 286 Mich App at 679. Accordingly, Alexander, Pagel and Carpenter are not entitled to relief on this issue.

V. PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL

All four defendants raise various claims of prosecutorial misconduct. Alexander and Carpenter also raise related claims of ineffective assistance of counsel based on the failures by

each of their respective trial attorneys to object to certain instances of alleged prosecutorial misconduct.

## A. STANDARDS OF REVIEW

When reviewing claims of prosecutorial misconduct, the applicable test is "whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64.

To preserve a claim of prosecutorial misconduct, the defendant must raise a contemporaneous objection and request a curative instruction. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016). Preserved claims of prosecutorial misconduct are reviewed de novo. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). Unpreserved prosecutorial misconduct issues are reviewed for plain error affecting substantial rights. *People v Bailey*, 310 Mich App 703, 721; 873 NW2d 855 (2015). This Court will not find error requiring reversal where a curative instruction could have alleviated any prejudicial effect. *Id.* at 721-722. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id.* at 722 (quotation marks and citation omitted).

We review a trial court's decision denying a defendant's motion for a mistrial for an abuse of discretion, which occurs if the decision "falls outside the range of principled outcomes." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014).

> The trial court should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way. The trial court may consider, among other things, whether the prosecutor intentionally presented the information to the jury or emphasized the information. [*Id.* (quotation marks and citations omitted).]

To establish ineffective assistance of counsel, a defendant must demonstrate the following:

> (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018), quoting *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984).]

Because there has been no evidentiary hearing regarding the ineffective assistance of counsel claims raised by Alexander or Carpenter, review of those claims is limited to mistakes apparent from the record. *People v Foster*, 319 Mich App 365, 390; 901 NW2d 127 (2017).

## B. ANALYSIS

### 1. JONES'S PLEA AGREEMENT

-15-

Alexander argues that the prosecutor improperly bolstered the credibility of Jones by eliciting testimony from Jones that his plea agreement obligated him to provide "truthful testimony" and by repeatedly referring to this obligation to testify truthfully, including during the prosecutor's closing argument. Alexander acknowledges on appeal that his trial counsel did not object to this alleged misconduct, and the issue is therefore unpreserved and reviewed on appeal for plain error. *Solloway*, 316 Mich App at 201; *Bailey*, 310 Mich App at 721.

In *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995), our Supreme Court recognized that "[i]ncluded in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." The Court clarified that reference to a plea agreement in which an individual promised to testify truthfully does not necessarily present grounds for reversal. *Id.* The Court explained:

> A more accurate statement of the law appears to be that, although such agreements should be admitted with great caution, admissibility of such an agreement is not necessarily error unless it is used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully. [*Id.* (quotation marks and citation omitted).]

In this case, although the prosecutor elicited that Jones's plea agreement required him to provide truthful testimony and commented on that evidence in closing argument, neither the prosecutor's questioning of Jones nor his closing remarks suggested that the prosecution had special knowledge that Jones was telling the truth. These references were brief, and the prosecutor referred to other evidence and testimony to argue that Jones's version of the events was truthful and accurate. "Generally, '[b]y calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness' veracity.' " *Bahoda*, 448 Mich at 276 (citation omitted; alteration in original). Any potentially unfair prejudicial effect of these statements could have been alleviated by a curative instruction had Alexander requested one, and Alexander therefore has not demonstrated plain error requiring reversal. *Bailey*, 310 Mich App at 721-722.

Moreover, even without an objection by defense counsel, the trial court instructed the jury that "[t]he lawyers' statement[s], arguments, and any commentary are not evidence. They are only meant to help you understand the evidence and each side's legal theories." The trial court further instructed the jurors in detail that they should examine the testimony of Jones "closely," since he was an accomplice, and that the jurors should "be very careful about accepting it." The jury was also instructed as follows regarding the testimony of Jones:

> When you decide whether you believe an accomplice, consider the following: Was the accomplice's testimony falsely slanted to make the Defendant seem guilty because of the accomplice's own interests, biases, or for some other reason?
>
> Has the accomplice been offered a reward or been promised anything that might lead him to give false testimony? Has the accomplice been promised that he

will not be prosecuted or promised a lighter sentence or allowed to plead guilty to a less serious charge? If so, could this have influenced his testimony?

In general, you should consider an accomplice's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.

We conclude that these instructions were sufficient to protect Alexander's substantial rights and to prevent any potential for unfair prejudice stemming from the comments Alexander now challenges on appeal. Alexander has not established plain error requiring reversal. *Bailey*, 310 Mich App at 721-722.

Alexander argues in the alternative that his trial counsel was ineffective for failing to object to these references to Jones's agreement to provide truthful testimony. However, considering the brief nature of these references and the detailed instructions provided to the jury related to Jones's testimony, the lack of a specific objection was not objectively unreasonable. Nor can we conclude that but for the lack of an objection, there is a reasonable probability that the outcome of the trial would have been different. Thus, Alexander has failed to show that he received ineffective assistance of counsel. *People v Randolph*, 502 Mich at 9. Accordingly, Alexander is not entitled to relief on this issue.

## 2. ALLEGED WITNESS INTIMIDATION

Next, Eubanks and Pagel argue that the prosecutor committed misconduct by asking a question of Sutton that implied that Sutton had been intimidated by some other individual regarding his trial testimony. Eubanks and Pagel further argue that the trial court abused its discretion by denying Eubanks's motion for a mistrial based on this questioning.

On direct examination of Sutton, the prosecutor asked, "Before coming into the courtroom today, did somebody approach you out in the hallway to discuss—". A defense objection prevented the prosecutor from completing the question and Sutton never answered. After the trial court excused the jury, Eubanks moved for a mistrial. After reviewing a video of the exchange, the trial court denied the motion for a mistrial because the question was not completed or answered as a result of the objections and there was accordingly no tainting of the jury.

"A prosecutor can deny a defendant his or her right to a fair trial by making improper remarks that so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Lane*, 308 Mich App at 62 (quotation marks and citations omitted; alteration in original).

As the trial court in the present case observed, the prosecutor asked an isolated and fairly general question regarding whether anyone had approached Sutton in the hallway. The prosecutor was unable to finish the question before being interrupted, and there was no mention in front of the jury of any reason why Sutton was approached, let alone any suggestion of intimidation. Contrary to defendants' arguments on appeal, the portion of the question that the jury actually heard does not automatically imply that a defendant or any other individual attempted to influence Sutton's testimony. Accordingly, defendants have not shown that the prosecutor's remark "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process,"

-17-

*Lane*, 308 Mich App at 62 (quotation marks and citations omitted), and the trial court did not abuse its discretion by denying the motion for a mistrial, *id*. at 60 ("The trial court should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way.") (quotation marks and citations omitted).

In a related issue, Carpenter argues that the prosecutor engaged in misconduct by continuing to question Sutton, on redirect examination, regarding potential intimidation after the trial court had prohibited the prosecutor from eliciting such evidence. The challenged line of questioning was responsive to Carpenter's trial counsel's cross-examination of Sutton. The record indicates that counsel for Carpenter first asked Sutton why he was reluctant to testify and directly inquired whether any of the defendants had anything to do with that reluctance. Sutton responded by indicating that he was concerned for his safety because of the neighborhood in which he lived, but he clarified that his concern did not arise because of any of the four defendants. On redirect examination by the prosecutor, Sutton conceded that he did not tell the jury everything during his first day of testimony. Additionally, when the prosecutor inquired what was interfering with his testimony, Sutton referred to people yelling at him in the hallway outside the courtroom and indicated that although he was attempting to tell the truth, he was concerned about "what's going to happen to me."

Evaluating the prosecutor's questioning in context, *Dobek*, 274 Mich App at 64, we conclude that the prosecutor was responding to issues raised by Carpenter's trial counsel on cross-examination and permitting Sutton to explain reasons for apparent inconsistencies in his testimony. Carpenter has not demonstrated that he was denied a fair and impartial trial on this basis. *Id*. at 63; see also *id*. at 64 ("Otherwise improper prosecutorial conduct or remarks might not require reversal if they address issues raised by defense counsel."). Sutton had also made clear that defendants had not caused his concerns about testifying. Moreover, Carpenter did not object to this questioning on redirect examination of Sutton, and an appropriate curative instruction could have alleviated the potential for prejudice perceived by Carpenter; thus, Carpenter has not shown error requiring reversal. *Bailey*, 310 Mich App at 721-722.

### 3. PROSECUTOR'S CHARACTERIZATION OF EVIDENCE

Next, Pagel argues that the trial court abused its discretion by denying his motion for a mistrial that was based on the prosecutor's characterization of evidence in the context of arguing against objections by defendants related to the admissibility of certain video evidence depicting defendants in a car. In the statement at issue, the prosecutor stated as follows:

> Judge, I have a foundation with this witness[7] that these are the four individuals that were with him at – that participated in the home invasion and the homicide. I've got them in the same clothing with the firearms that were used. Seems to me it's relevant.

---

[7] Jones was testifying at this point.

The prosecutor's isolated comment was made in response to objections to evidence by defendants, who questioned the foundation for the evidence and whether the prosecutor had exceeded the bounds of the trial court's instructions with regard to admission of the evidence and how much of the video could be played at that point in the trial. As soon as the above quoted comment by the prosecutor was made, another objection was raised and the trial court excused the jury. The court later denied defendants' motion for a mistrial, noting that the remark involved a statement by an attorney that was not evidence and that the remark did not rise to the level that it would prejudice the jury to the extent that a mistrial was required.

We conclude that to the extent that the prosecutor's comment could be considered improper, it was isolated and made in the context of arguing for the admissibility evidence in response to defendants' objections. Although an immediate curative instruction was not given, none of the defendants asked for one. However, the trial court later instructed the jury that attorney statements, arguments, and commentary are not evidence. Considering the record as a whole and evaluating the prosecutor's argument in context, Pagel has not shown that he was denied a fair and impartial trial. *Dobek*, 274 Mich App at 63-64. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Bailey*, 310 Mich App at 722 (quotation marks and citation omitted). Hence, the trial court also did not abuse its discretion by denying the motion for a mistrial. *Lane*, 308 Mich App at 60.

### 4. INJECTION OF RACE AND GANG CULTURE

Next, Carpenter argues that the prosecutor acted improperly and denied him a fair trial by "interjecting race and gang culture into the trial to appeal to the passions and fears of the jurors."

Carpenter refers to evidence of defendants' nicknames; photographic evidence depicting some of the defendants making what Carpenter alleges are gang signs; and cell phone video evidence showing defendants in a vehicle with Alexander smoking marijuana, Carpenter making what he alleges on appeal are gang signs, Alexander holding a gun, and Alexander mouthing along with rap music that was playing on the vehicle's stereo and that contained profanity. This video evidence, which Carpenter asserts was "the most egregious example," was admitted during Jones's testimony over defendants' objections and was admitted for the purpose of allowing Jones to identify each defendant and what they were wearing on the night of the home invasion and homicide. As alluded to above, this video evidence was the subject of subsequent objections and discussions over whether the prosecutor played more of the video than the trial court's ruling had actually permitted, and the trial court denied a motion for a mistrial that was based on the prosecutor's argument that included a statement that the video depicted guns used in the crimes.

On appeal, Carpenter essentially argues that the prosecutor engaged in misconduct by admitting this "inflammatory and wholly unnecessary character evidence meant to paint he and his alleged accomplices as dangerous gang members and young black men who should be feared." A prosecutor may not intentionally interject potentially inflammatory references "with no apparent justification except to arouse prejudice." *Bahoda*, 448 Mich at 266. However, although Carpenter contends on appeal that this evidence shows that defendants were associated with gang culture, the prosecution did not present it as such at trial or argue that the evidence showed defendants to be affiliated with a gang; Carpenter has not directed our attention to any portion of the record where

-19-

the prosecutor actually made such an assertion. At trial, Carpenter did not seek a curative instruction related to the perceived prejudice of which he now complains on appeal, and this issue is therefore unpreserved. *Solloway*, 316 Mich App at 201. Such an instruction could have alleviated any improper prejudice in this respect, and Carpenter therefore has not demonstrated error requiring reversal. *Bailey*, 310 Mich App at 721-722.

## 5. ARGUING FACTS NOT IN EVIDENCE

Eubanks also argues that the prosecutor improperly argued facts not in evidence during closing argument by "comparing him with notorious criminals."

"The prosecutor may not make a statement of fact that is unsupported by the evidence." *Lane*, 308 Mich App at 67. "A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial." *Dobek*, 274 Mich App at 64. "Otherwise improper prosecutorial conduct or remarks might not require reversal if they address issues raised by defense counsel." *Id*. Additionally, "juries are permitted to view evidence in light of their common knowledge or experience." *Bailey*, 310 Mich App at 722.

In this case, the challenged remarks were made during the prosecutor's rebuttal argument and were responsive to defense counsel's argument that the jury should consider Eubanks's positive background and character traits—specifically that Eubanks was a college student, attended church, and worked three jobs that included a job working for a college professor—in deciding Eubanks's guilt or innocence. In rebuttal, the prosecutor referenced other known criminals (Bernie Madoff and the Las Vegas shooter, Stephen Paddock) who had impressive credentials or positive character traits and remarked that "those things that you may hear–hear about in terms of a jury instruction about character for going to school, or having a job, or going to church are really little–little value in terms of actually making decisions about a – about his character in relationship to committing these crimes." Viewed in context, the prosecutor was simply countering defense counsel's argument that Eubanks's positive character traits were a reason to doubt his guilt. In conveying this point, the prosecutor provided examples within the realm of common knowledge regarding other individuals who had committed crimes despite having positive backgrounds and character traits to argue that an individual who has an education, is gainfully employed, and attends church can still engage in criminal activity. Considering the nature of the remarks within the context of responding to the defense argument, they were not clearly improper. *Dobek*, 274 Mich App at 64; *Bailey*, 310 Mich App at 722. Moreover, a curative instruction, had one been requested, could have alleviated any perceived prejudice. See *Bailey*, 310 Mich App at 721-722. Accordingly, Eubanks has not demonstrated error requiring reversal.

## 6. CARPENTER'S REMAINING PROSECUTORIAL MISCONDUCT ARGUMENTS

Next, Carpenter argues that the prosecutor engaged in misconduct by falsely promising not to introduce the out-of-court statements of his codefendants, causing Carpenter to forgo requesting a separate jury at trial. "A prosecutor has the responsibility of a minister of justice, not simply that of an advocate." *People v Jones*, 468 Mich 345, 354; 662 NW2d 376 (2003).

However, the record in this case does not support Carpenter's claim that the prosecution represented before trial that it would not introduce any out-of-court statements of Carpenter's

codefendants. As Carpenter admits, there is no record of such an agreement. Moreover, Carpenter merely asserts in his brief, without any evidence, that "at some point between September 2018 and the first day of trial, the prosecutor agreed not to introduce the defendants' hearsay statements during the trial and the parties and the trial court agreed to utilize a single jury." Because Carpenter has not established any record support for this alleged agreement, he has failed to show that he is entitled to any relief based on this claim of error. Defendant, as the appellant, bears "the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000).

Carpenter also argues that trial counsel was ineffective by (1) failing to ensure that the prosecutor's alleged promise was placed on the record, and (2) failing to object to the out-of-court statements of Alexander and Eubanks on the basis of the prosecutor's alleged promise. However, a "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Because Carpenter has not established factual support for his claim that such a promise was in fact made, he also has not demonstrated that he is entitled to any relief on his related ineffective-assistance claim. *Id.*

Carpenter next argues that the prosecutor improperly introduced "wholly irrelevant" evidence of the Papkey home invasion that exceeded the scope for which this evidence had been admitted under MRE 404(b)(1) in an effort to evoke sympathy for Papkey and scorn for defendants and Jones. Carpenter refers to the prosecutor's elicitation of evidence through Papkey regarding what happened after defendants and Jones left Papkey's residence and about Papkey's 911 calls. Carpenter concedes on appeal that he did not object to this evidence on this basis in the trial court. Our review is thus for plain error. *Bailey*, 310 Mich App at 721. To the extent that this evidence had the potential to create the perceived prejudice of which Carter now complains on appeal, it could have been avoided by a timely objection and properly tailored curative instruction. Accordingly, Carter has not demonstrated error requiring reversal. *Id.* at 721-722.

Next, Carter makes a single-sentence argument that his trial counsel was ineffective for failing to object to the above referenced evidence related to the Papkey home invasion. The entirety of Carter's appellate argument states that trial counsel "performed deficiently when he failed to specifically object when it became evident that the prosecutor's questions were no longer intended to generate responses related to the purportedly proper purpose the prosecutor proffered." This is an insufficient attempt to raise an issue meriting appellate review and constitutes abandonment of this issue. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Waclawski*, 286 Mich App at 679 (quotation marks and citation omitted). Moreover, even if Carter had demonstrated that his trial counsel's performance was objectively deficient in failing to object to the challenged evidence, we cannot conclude that but for this failure, there is a reasonable probability that the trial outcome would have been different

considering the overwhelming other evidence of guilt in the record, unrelated to the evidence Carter now challenges. *Randolph*, 502 Mich at 9.[8]

## VI. JURY INSTRUCTIONS

Next, Alexander argues that the trial court erred by denying his request to instruct the jury on the lesser included offense of second-degree murder. Alexander contends that a rational view of the evidence supported a finding of second-degree murder without the attendant commission of a first-degree home invasion. First-degree home invasion was the predicate felony on which the felony-murder charge was based.

This Court reviews claims of instructional error de novo. *People v Traver*, 502 Mich 23, 31; 917 NW2d 260 (2018). However, "[t]his Court reviews for an abuse of discretion the trial court's decision regarding the applicability of a jury instruction to the facts of a specific case." *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014).

"A court must properly instruct the jury so that [the jury] may correctly and intelligently decide the case." *Traver*, 502 Mich at 31 (quotation marks and citation omitted; alteration in original). "The instruction to the jury must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *Id*. (quotation marks and citation omitted).

> [T]here are lesser included offenses to first-degree felony-murder. Second-degree murder is always a lesser included offense of first-degree murder. First-degree murder is second-degree (common law) murder *plus* an element, *viz.*, either premeditation or the perpetration or attempt to perpetrate an enumerated felony. Conversely, second-degree murder is first-degree murder *minus* premeditation or the enumerated felony. [*People v Clark*, 274 Mich App 248, 257; 732 NW2d 605 (2007) (quotation marks and citation omitted; alteration in original).]

Nonetheless, "the trial court is no longer automatically required to provide an instruction on second-degree murder when it is unsupported by the evidence . . . ." *People v Hall*, 256 Mich App 674, 677; 671 NW2d 545 (2003). Our Supreme Court has held that "a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view

---

[8] Given our conclusions and analysis regarding Carpenter's various claims of prosecutorial misconduct, we also conclude that he has not demonstrated an entitlement to relief based on his single sentence assertion that "[e]ven if the Court disagrees that any one instance of misconduct was sufficient to deny Mr. Carpenter a fair trial, the cumulative impact of all the misconduct, when considered together, clearly did." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001) (observing that the cumulative impact of numerous errors may warrant reversal even if the individual errors would not but that reversal on the grounds of cumulative error requires the errors to be "of consequence" and to have had a "seriously prejudicial" effect on the fairness of the trial). Carpenter's bare assertion does not show that the standard in *Knapp* was met. Rather, it constitutes abandonment of this issue. *Waclawski*, 286 Mich App at 679.

of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002). "[W]here a trial court erroneously refuses to give a requested instruction on a necessarily included lesser offense, a harmless-error analysis applies to the instructional error." *Hall*, 256 Mich App 674, 677; 671 NW2d 545 (2003). In the present context, a defendant generally "must demonstrate that it is more probable than not that the failure to give the requested lesser included [offense] instruction undermined reliability in the verdict." *Cornell*, 466 Mich at 364.

In this case, Alexander argues that the trial court abused its discretion by declining to instruct the jury on second-degree murder because, according to Alexander, there was evidence to support his contention that the breaking-and-entering element of first-degree home invasion was not satisfied such that the enumerated-felony element of felony-murder was in dispute. Assuming without deciding that Alexander is correct, any error in declining to give a second-degree murder instruction was harmless because the jury nevertheless convicted Alexander of first-degree home invasion. *Id*. Accordingly, Alexander has failed to establish error requiring reversal.[9]

## VII. AUTHENTICATION OF EVIDENCE

Next, Pagel argues that the trial court erred by admitting video evidence, which has already been referenced in this opinion, purporting to show defendants together in a vehicle on the night of the home invasion and murder. Pagel contends that this evidence was not properly authenticated.

As previously stated, we review a trial court's ultimate decision regarding the admissibility of evidence for an abuse of discretion and any underlying questions of law de novo. *Duenaz*, 306 Mich App at 90.

MRE 901(a) provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

---

[9] Alexander, relying on *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999), asserts that his claim of error is one of constitutional magnitude such that the proper standard is whether the error was shown by the prosecution to have been harmless beyond a reasonable doubt. Alexander does not address the harmless-error standard applied to this context in *Cornell* or otherwise explain why that standard is inapplicable under the facts of this case. However, even assuming without deciding that Alexander is correct about the applicable harmless-error standard in this case, any error in declining to instruct the jury on second-degree murder was still harmless beyond a reasonable doubt under these circumstances because the jury found beyond a reasonable doubt that Alexander committed the first-degree home invasion when it convicted him of that crime.

The question whether evidence has been properly authenticated for purposes of admissibility is a threshold question "reserved solely for the trial judge" and involves a determination "whether there is sufficient reason to believe that the evidence is what its proponent claims for purposes of admission into evidence." *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 154; 908 NW2d 319 (2017). "In the role as evidentiary gatekeeper, the trial judge must make the initial determination of whether the evidence is admissible—a question that depends, among other things, on whether the evidence can be authenticated." *Id.* at 154-155. This Court further explained in *Mitchell*:

> Under MRE 901(a), to authenticate a piece of evidence, the proponent of that evidence bears the burden of bringing forth "evidence sufficient to support a finding that the matter in question is what its proponent claims." Our evidentiary rules do not require the proponent to sustain this burden in any particular fashion. See MRE 901(b). Indeed, evidence supporting authentication may be direct or circumstantial and need not be free of all doubt.
>
> Michigan courts have interpreted MRE 901(a) as requiring the proponent only to make a prima facie showing that a reasonable juror might conclude that the proffered evidence is what the proponent claims it to be. Once the proponent of the evidence has made the prima facie showing, the evidence is authenticated under MRE 901(a) and may be submitted to the jury. [*Id.* at 155 (some citations omitted).]

As our Supreme Court has also explained:

> It is axiomatic that proposed evidence need not tell the whole story of a case, nor need it be free of weakness or doubt. It need only meet the minimum requirements for admissibility. Beyond that, our system trusts the finder of fact to sift through the evidence and weigh it properly.
>
> If a tape, or any other proposed exhibit that is subject to the MRE 901 requirement of authentication, is shown to be "what its proponent claims," then it has been authenticated sufficiently. [*People v Berkey*, 437 Mich 40, 52; 467 NW2d 6 (1991) (citation omitted).]

In this case, Jones testified that he recognized the four defendants in the video and that he was with them during the nighttime hours leading up to the Ballard home invasion. Jones further testified that all four defendants were dressed in the same clothing in the video that they were wearing when they picked him up from his apartment at approximately 1:00 a.m. on July 11, 2017, supporting his contention that the video was taken on the night of the incident. Hence, the prosecution met the minimum requirements for admissibility of the challenged video evidence by making a prima facie showing that the video was what it purported to be, i.e., a video showing defendants together in a vehicle on the night of the home invasion and murder. *Id.*; *Mitchell*, 321 Mich App at 154-155. Pagel has not shown any error by the trial court in admitting this evidence. *Duenaz*, 306 Mich App at 90.

VIII. LAY OPINION TESTIMONY

Pagel also argues that Flint Police Detective Jonathan Miller's testimony identifying Pagel's voice in the above referenced video exhibit was inadmissible and invaded the province of the jury.

We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion and any underlying questions of law de novo. *Duenaz*, 306 Mich App at 90.

MRE 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Although MRE 701 is the only rule of evidence cited by Pagel under which he believes Miller's voice identification testimony was inadmissible, it is difficult to discern from Pagel's rambling argument how he believes the trial court erred in applying MRE 701 or what his asserted basis for appellate relief is. Pagel appears to argue that Miller's opinion was not rationally based on his own perception because his familiarity with Pagel's voice was gained by listening to him over the telephone.

However, an investigating police officer's testimony is rationally based on the officer's perception even where the testimony is based on having perceived recorded evidence during the course of the investigation, as opposed to having witnessed live events in real time. See *People v Fomby*, 300 Mich App 46, 50-51; 831 NW2d 887 (2013) (concluding that a police officer's testimony was "rationally based on his perception" for purposes of MRE 701 where the officer "was not at the scene while the video footage was being recorded and did not observe firsthand the events depicted on the video" but had instead "watched the video, produced short clips of the individuals while they were inside the store, and isolated certain frames to create still images").

To the extent Pagel appears to imply that lay opinion testimony that affirmatively identifies a defendant, such as Miller's testimony in this case identifying Pagel's voice in the video exhibit based on Miller's familiarity with Pagel's voice gained by hearing it over the telephone during the course of the investigation, is never admissible, Pagel's argument is legally incorrect. Although such lay opinion identification testimony may generally be inadmissible under MRE 701 if the witness is in no better position than the jury to make the identification, such lay opinion identification testimony may nonetheless be admissible if there is "reason to believe that the witness is more likely to identify correctly the person than is the jury." See *Fomby*, 300 Mich App at 52-53 (quotation marks and citation omitted). In this case, Pagel does not claim that the jury was in a comparable position to Miller with respect to identifying Pagel's voice. Nor does Pagel contend that Miller was not more likely than the jury to correctly identify Pagel's voice. Accordingly, Pagel has not demonstrated that this testimony invaded the province of the jury or that the trial court abused its discretion in admitting this testimony. *Id*. at 50-53.

## IX. SENTENCING

All four defendants raise multiple challenges to their sentences, generally involving issues concerning the reasonableness or proportionality of their sentences, the scoring of the guidelines,

the imposition of consecutive sentences, and restitution.  After setting forth the applicable standards of review, we will address each defendant's sentencing issues in turn.

## A.  STANDARDS OF REVIEW

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015).  When reviewing a sentence for reasonableness, this Court must review "whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017).

When reviewing a trial court's sentencing guidelines scoring decision, "the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.*

A "consecutive sentence may be imposed only if specifically authorized by statute." *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012) (quotation marks and citation omitted).  When a statute authorizes a trial court to exercise its discretion to impose a consecutive sentence but does not mandate consecutive sentencing, this Court reviews the trial court's decision to impose a consecutive sentence for an abuse of discretion.  *Id.* at 401 n 8.

## B.  DEFENDANT ALEXANDER

### 1. PROPORTIONALITY

Alexander first argues that his sentences for first-degree home invasion, conspiracy to commit first-degree home invasion, assault with intent to rob while armed, and armed robbery constituted unreasonable upward departures in violation of the principle of proportionality.

Despite acknowledging that the trial court set forth its reasons on the record for departing upward, Alexander asserts that the trial court imposed unreasonable sentences because "the trial court focused solely on the seriousness of the offenses themselves and totally ignored the other half of the equation, that is, the circumstances surrounding the offender, and in this case, there are compelling mitigating circumstances surrounding the offender." These mitigating circumstances, according to Alexander's appellate argument, were his lack of prior felony convictions, lack of juvenile criminal history, and that he had only one prior misdemeanor conviction.  This is the entire

basis of Alexander's argument, and he does not challenge the trial court's stated findings in support of upward departure.[10]

The record flatly contradicts the factual premise of Alexander's appellate argument. Before announcing its sentencing decision, the trial court explicitly acknowledged Alexander's minimal criminal history on the record at the sentencing hearing and affirmatively indicated that it had reviewed the presentence investigation report (PSIR) and several letters that had been received on Alexander's behalf. The trial court indicated that it considered these facts, along with numerous others related to the criminal offenses, in reaching its sentencing decision. It is thus evident that the trial court considered the factors cited by Alexander on appeal, contrary to his assertion otherwise. Hence, Alexander has not demonstrated any basis for concluding that the principle of proportionality was violated. *Steanhouse*, 500 Mich at 459-460.

## 2. CONSECUTIVE SENTENCES

Alexander next argues that the trial court abused its discretion by ordering each of his sentences for felony murder, home invasion, conspiracy to commit home invasion, assault with intent to rob, and armed robbery to be served consecutively with each other.

The trial court apparently relied on MCL 750.110a(8), which provides:

> The court may order a term of imprisonment imposed for home invasion in the first degree to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction.

Alexander's appellate arguments present questions of statutory construction, which this Court reviews de novo. *Ryan*, 295 Mich App at 400.

> The overriding goal of statutory interpretation is to ascertain and give effect to the Legislature's intent. The touchstone of legislative intent is the statute's language. The words of a statute provide the most reliable indicator of the Legislature's intent and should be interpreted on the basis of their ordinary meaning and the overall context in which they are used. An undefined statutory word or phrase must be accorded its plain and ordinary meaning, unless the undefined word or phrase is a "term of art" with a unique legal meaning. When we interpret the Michigan Penal Code, we do so according to the fair import of the terms, to promote justice and to effect the objects of the law. [*Id.* (quotation marks and citation omitted).]

---

[10] Because Alexander does not challenge the propriety of these findings, we need not address them. His sole argument is that the trial court did not consider his minimal criminal history. However, as discussed above, the trial court did consider his criminal history. Because Alexander has not raised any other challenge to the proportionality of his sentence other than a factually unsupported one, he has abandoned any further arguments. *Waclawski*, 286 Mich App at 679.

-27-

First, Alexander argues that this statutory provision only authorizes the first-degree home invasion sentence to be imposed consecutively to one other offense arising out of the same transaction, rather than the multiple consecutive sentences imposed in this case, because the "statute is written in the singular, not the plural."

In *Ryan*, 295 Mich App at 392, this Court interpreted MCL750.520b(3), which authorizes consecutive sentences in the context of first-degree criminal sexual conduct (CSC-1) and uses language substantively identical to that in MCL 750.110a(8). MCL 750.520b(3) provides that "The court may order a term of imprisonment imposed under this section to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." "When an undefined statutory term has been the subject of judicial interpretation, we presume that the Legislature used the particular term in a manner consistent with the prior construction." *Ryan*, 295 Mich App at 400-401.

The issue before this Court in *Ryan* was not identical to the issue presented in this case: in *Ryan*, the issue was whether the "other" criminal offense referenced in the statute had to be a non-CSC-1 offense or whether consecutive sentences could be imposed for two or more distinct CSC-1 offenses that arose from the same transaction. *Id*. at 399, 404-405. Although this Court in *Ryan* was not required to definitively resolve the question whether the statute limited a trial court to imposing only one consecutive sentence since the defendant in that case had only received one consecutive sentence, see *id*. at 391, 398-399, 402, this Court concluded that the discretionary authority to impose consecutive sentences granted to the trial court in the statute was not so limited by holding that "the phrase 'any other criminal offense' can encompass additional *violations* of the same CSC–1 statute." *Id*. at 407 (emphasis added).

Moreover, we now conclude that this Court's reasoning in *Ryan* that supported our holding in that case that the statute did not prohibit a trial court from imposing consecutive sentences for distinct CSC-1 offenses arising from the same transaction, see *id*., also supports our conclusion in the instant case that the phrase "any term of imprisonment imposed for any other criminal offense" does not prohibit a trial court from imposing multiple consecutive sentences if there were multiple criminal offenses arising from the same transaction. In *Ryan*, this Court reasoned in relevant part as follows:

> The language and sentence structure of MCL 750.520b(3) dictate that criminal offenses, when being examined to determine whether they are the same or different for purposes of consecutive sentencing, be viewed in relationship to the "term[s] of imprisonment imposed" thereon or, in other words, in relationship to their sentences. The distinction between "a term of imprisonment imposed under [MCL 750.520b]" and the "term of imprisonment imposed for any other criminal offense" necessarily embodies or includes a distinction predicated on the *sentences* imposed. Therefore, the phrase "any other criminal offense" means a different sentencing offense, and offenses, for purposes of sentencing, are always reduced or broken down into individual counts. Sentences or terms of imprisonment are imposed for each count of a crime on which a defendant is convicted, including counts arising from the same transaction. Each count in an information constitutes a separate crime. A crime such as CSC–1 can be committed in myriad ways and *give rise to multiple counts arising from the same transaction, leading to sentences*

-28-

*on each count*. While sentences on multiple counts of any crime may be imposed to run concurrently, and although the length of those sentences may be identical, they are still separately imposed sentences for each and every count.

A fair import of the language in MCL 750.520b(3) is that the trial court had the discretion to impose a term of imprisonment for defendant's act of engaging in vaginal intercourse with the victim—CSC–1, count 9—to be served consecutively to the term of imprisonment imposed for defendant's act of engaging in fellatio with the victim—CSC–1, count 3—as count 3 was a different or distinct criminal offense, given that it was not the same act as the act of vaginal intercourse that formed the basis of count 9. While the two counts are both CSC–1 offenses, they are distinct in the sense that they pertained to different acts of sexual penetration and could independently support imposition of a term of imprisonment; they stand on their own as criminal offenses. Count 3 constitutes "any other criminal offense" when viewed in relationship to, or in conjunction with, count 9. The Legislature's *use of the word "any" is all-encompassing and does not permit us to exclude from consideration other CSC–1 offenses upon which a term of imprisonment was imposed.* [*Ryan*, 295 Mich App at 405-406 (some citations omitted; second and third emphases added).]

Accordingly, we hold that MCL 750.110a(8) authorizes a trial court to impose multiple consecutive sentences for "any other criminal offense arising from the same transaction," meaning *all* other criminal offenses arising from the same transaction. Furthermore, the statute clearly does not mandate consecutive sentences but instead indicates that a "court *may* order a term of imprisonment imposed for home invasion in the first degree to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." MCL 750.110a(8). Accordingly, the decision to impose a consecutive sentence under this statute is discretionary. *Ryan*, 295 Mich App at 401 n 8.

Next, Alexander argues that the trial court nonetheless abused its discretion by failing to properly justify its decision to impose multiple concurrent sentences.

"[T]rial courts imposing one or more discretionary consecutive sentences are required to articulate on the record the reasons for each consecutive sentence imposed." *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016) (*Norfleet I*). "[A] trial court may not impose multiple consecutive sentences as a single act of discretion nor explain them as such. The decision regarding each consecutive sentence is its own discretionary act and must be separately justified on the record." *Id*. at 665.

In this case, as Alexander argues, the trial court apparently relied on the same reasons to justify its upward departure sentences and all of its discretionary consecutive sentences.[11] The trial court stated these reasons at the beginning of announcing its sentences for Alexander's

---

[11] The trial court's treatment of the felony-firearm sentences are not at issue in this appeal. "[T]he Legislature has mandated that felony-firearm sentences be imposed consecutively to any other." *Norfleet I*, 317 Mich App at 663, citing MCL 750.227b(3).

convictions and then appeared to indicate as it imposed each discretionary consecutive sentence that it was doing so for the reasons already stated. Although the trial court in this manner did attempt to provide a rationale for its decisions so as to facilitate appellate review, we conclude that it constituted a misapplication of the standard for imposing multiple consecutive sentences because it appears to be more of a single act of discretion rather than a separate justification for each additional consecutive sentence. As this Court has recognized, there must be a separate justification for imposing each additional consecutive sentence because there is a difference of degree between two consecutive sentences and three, four, or five consecutive sentences. See *id.*

> While imposition of more than one consecutive sentence may be justified in an extraordinary case, trial courts must nevertheless articulate their rationale for the imposition of each consecutive sentence so as to allow appellate review. As the *Milbourn* Court aptly stated, "Discretion, however, is a matter of degree, not an all or nothing proposition." *Milbourn*, 435 Mich at 664. Additionally, we believe that requiring trial courts to justify each consecutive sentence imposed will help ensure that the "strong medicine" of consecutive sentences is reserved for those situations in which so drastic a deviation from the norm is justified. [*Id.*]

The trial court must "give particularized reasons—with reference to the specific offenses and the defendant—to impose *each* sentence . . . consecutively to the others." *Id.* at 666. See also *People v Norfleet (After Remand)*, 321 Mich App 68, 73; 908 NW2d 316 (2017) (*Norfleet II*) ("We agree that this combination of facts was sufficient to depart from the heavy presumption in favor of concurrent sentences and to order *one* of the sentences to be served consecutively to another. The trial court properly recognized that it could not impose multiple consecutive sentences as a single act of discretion and correctly issued a judgment of sentence in which the remaining sentences are all to be served concurrently.").

Accordingly, as we did in *Norfleet I*, we remand this matter for the trial court to revisit its decision regarding the imposition of consecutive sentences for Alexander's felony murder, home invasion, conspiracy to commit home invasion, assault with intent to rob, and armed robbery convictions "so that the trial court can fully articulate its rationale for each consecutive sentence imposed." *Norfleet I*, 317 Mich App at 666.

## C. DEFENDANT EUBANKS

As previously stated, the jury convicted Eubanks of first-degree home invasion and conspiracy to commit first-degree home invasion. The jury acquitted Eubanks of felony murder, assault with intent to rob while armed, armed robbery, and five counts of felony-firearm. At sentencing, the trial court determined that Eubanks's sentencing guidelines range was 57 to 95 months. The trial court departed upward and sentenced Eubanks to a prison term of 140 to 240 months for each conviction, to be served consecutively.

On appeal, Eubanks argues that the trial court violated his due-process rights by relying on acquitted conduct to impose a harsher sentence. Eubanks relies on *People v Beck*, 504 Mich 605, 609; 939 NW2d 213 (2019), in which our Supreme Court held that "[o]nce acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime."

Eubanks first argues specifically that the trial court abused its discretion in imposing its upward departure and consecutive sentences on Eubanks because the court relied generally on all of the crimes of which Eubanks and his codefendants had been charged in considering the severe and harmful effects of these crimes on the victims and the neighborhood, even though Eubanks was only convicted of first-degree home invasion and conspiracy to commit first-degree home invasion while his codefendants were convicted of various combinations of the other charged crimes.

There is no preservation requirement for review of an upward departure sentence. *People v Smith*, 482 Mich 292, 300; 754 NW2d 284 (2008).

In this case, the trial court stated that its sentencing of Eubanks was based on "all of the things . . . that I have sat through . . . and the information that has been presented to me." The trial court continued to explain its sentencing decision as follows:

> And for the record to be accurate, I do want to state, um, Mr. Eubanks, you had the lowest offense variables and the lowest guidelines scores of anyone in this case because of what you were convicted of and because of your, um, very, you know, lack of a criminal history other than the one misdemeanor.

> Uh, but your offense variable total again was beyond the maximum. And inadequate consideration of the offense variables really would not have much of an impact on this case.

> Um, I do find that OV4, offense variable four does not account for the extensive impact and psychological impact that *this* has had on the Ballard family and their neighbors who live, um, on either side . . . .

> I find that the Michigan sentencing guidelines do not consider the impact that *these crimes* had on, um, the Ballard family as a whole, uh, specifically on Janice Ballard and what she had to live through that night, and what I'm sure she continues to live with every moment of every day.

> Uh, the fact that she could never return to that home is compelling to this Court. Uh, the fact that she had to sell that home is compelling to this Court. And I, uh—the guidelines do not take into the consideration that these people victimized in the place where they should have been the most safe and the most protected, in their own home in the middle of the night.

> The seriousness of *the crimes* that were committed that rocked this neighborhood is compelling to this Court. And again, for your case to reflect that I have been advised in these letters that these people are moving, that they're selling their homes, that they're buying guns, buying large dogs, and no longer feel safe.

> And I remember one letter said that they don't like to let their children outside to play. And that's because of you and because of your friends and the choices you made that night.

Those are all compelling to this Court. The safety of the community at large is also a concern. Three different areas in Genesee County were targeted by you and your cohorts that night. There's a potential for just the safety of the community, uh, was at risk that night because of your choices.

All of these factors I have numerated individually compel me to depart from the sentencing guidelines and to impose consecutive sentences. And when considering them as a whole, certainly, I'm compelled to do so. [Emphasis added.]

After reviewing the trial court's stated rationale, we are unable to discern whether the trial court relied on the other crimes of which Eubanks was acquitted and other codefendants were convicted. We acknowledge that the trial court was clearly aware of the specific crimes of which Eubanks was actually convicted, but its statements about the effects on the victims and the neighborhood appeared to reference the entire criminal episode more generally. Under *Beck*, a trial court may not rely on acquitted conduct as an aggravating factor in imposing its sentence. *Beck*, 504 Mich at 629 ("Because the sentencing court punished the defendant more severely on the basis of the judge's finding by a preponderance of the evidence that the defendant committed the murder of which the jury had acquitted him, it violated the defendant's due-process protections."). As our Supreme Court in *Beck* explained:

When a jury has made no findings (as with uncharged conduct, for example), no constitutional impediment prevents a sentencing court from punishing the defendant as if he engaged in that conduct using a preponderance-of-the-evidence standard. But when a jury has specifically determined that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent. "To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself." [*Id*. at 626-627 (citation omitted).]

Accordingly, we remand for purposes of allowing the trial court to revisit its sentence of Eubanks in light of *Beck*.[12] On remand, the trial court shall make an appropriate record properly justifying its sentencing decision in light of the holding in *Beck*, whether it imposes the same sentence or determines that resentencing is warranted and resentences Eubanks. See *Steanhouse*, 500 Mich at 476 (stating that resentencing is required if the trial court "abused its discretion in applying the principle of proportionality by failing to provide adequate reasons for the extent of the departure sentence imposed"). Pursuant to *Beck*, acquitted conduct would not be an adequate reason for departure. *Beck*, 504 Mich at 626-627, 629. Furthermore, the holding in *Beck* actually extends further and is not limited only to the question of whether acquitted conduct may justify a departure: The *Beck* Court stated, "We hold that due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *Id*. at 629. Thus, pursuant to *Beck*, it violates due process to consider *acquitted* conduct

---

[12] We also recognize that our Supreme Court issued its opinion in *Beck* after the sentencing hearing in the present case.

-32-

in scoring the sentencing guidelines. See also *People v Roberts*, ___ Mich ___; 949 NW2d 455 (2020) (holding that pursuant to *Beck*, the trial court erred by relying on acquitted conduct in scoring offense variable 9 and in imposing an upward departure sentence).

Additionally, in light of our conclusion on this issue, we treat Eubanks's additional appellate arguments regarding the propriety of the scoring of his sentencing guidelines as a motion to remand and grant the motion to remand to permit these issues to be raised in the trial court. See MCR 6.429(C); MCR 7.216(A)(5).

We clarify that we only decide at this juncture that the trial court must address these issues under the proper standard in light of *Beck*. Thus, our opinion on these sentencing issues should not be understood to extend further.

## D. DEFENDANT CARPENTER

Next, Carpenter similarly argues that the trial court erred by relying on acquitted conduct in calculating his guidelines, imposing his upward departure sentences, imposing discretionary consecutive sentences, and ordering restitution. The jury acquitted Carpenter of felony murder, assault with intent to rob while armed and the felony-firearm counts associated with those two offenses. The jury found Carpenter guilty of first-degree home invasion, conspiracy to commit first-degree home invasion, and armed robbery, as well as the felony-firearm counts associated with each of those offenses. At the sentencing hearing, the trial court stated that it had determined that the guidelines range was 84 to 140 months for both his home invasion and conspiracy convictions and that the guidelines range was 171 to 285 months for his armed robbery conviction. The trial court departed from these ranges and sentenced Carpenter to prison terms of 158 to 240 months each for the home invasion and conspiracy convictions, and 380 to 720 months for the armed robbery conviction. As previously stated, these three sentences were ordered to be consecutive with each other.

The trial court placed its reasons for all of its upward departures and its imposition of discretionary consecutive sentences on the record, which were similar to those quoted above with respect to Eubanks. With respect to Carpenter in particular, the trial court stated in part:

> I find that Michigan sentencing guidelines do not consider the impact that *these crimes* had on that family. When we hear from Janice Ballard that she was never able to go back into that home and ultimately had to sell a home where her husband was *murdered*, um, impacts this Court's decision and do not, I do not feel that, that's, um, considered by the sentencing guidelines, something that has that type of an impact. [Emphasis added.]

Even more than with Eubanks, it appears that the trial court may have considered acquitted conduct in imposing its sentence on Carpenter. Thus, we also remand this matter for purposes of allowing the trial court to revisit its sentence of Carpenter in light of *Beck*. On remand, the trial court shall also make an appropriate record properly justifying its sentencing decisions regarding Carpenter in light of the holding in *Beck*, whether the court imposes the same sentence or determines that resentencing is warranted and resentences Carpenter. See *Steanhouse*, 500 Mich

-33-

at 476. As stated above, the trial court may not rely on acquitted conduct to justify a departure or the scoring of the guidelines. *Beck*, 504 Mich at 626-627, 629; *Roberts*, ___ Mich ___.

Furthermore, in light of our conclusion on this issue, we grant Carpenter's motion to remand to permit the trial court to address in the first instance Carpenter's various arguments challenging his sentence, including those that he raised in his appellate brief to this Court, in the first instance under the proper standard in light of *Beck*.

As with Eubanks, we only decide at this juncture with respect to Carpenter that the trial court must address these sentencing issues under the proper standard in light of *Beck*. Thus, our opinion on these issues should not be understood to extend further.

Finally, with respect to Carpenter, we order the trial court on remand to revisit its decision regarding the imposition of consecutive sentences for Carpenter's home invasion, conspiracy to commit home invasion, and armed robbery convictions "so that the trial court can fully articulate its rationale for each consecutive sentence imposed." *Norfleet I*, 317 Mich App at 666. We reach this conclusion for the same reasons expressed above with respect to Alexander's consecutive sentences that were imposed as acts of the trial court's discretion under MCL 750.110a(8).

### E. RESENTENCING BEFORE A DIFFERENT JUDGE

Carpenter also argues that he should be resentenced before a different judge because the trial court had an impermissible "personal connection" to the case.

When a defendant requests resentencing before a different judge, we employ the three-part test set forth in *People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997). *Beck*, 504 Mich at 610 n 2. Under this test, we consider

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. [*People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citation omitted).]

In this case, the factual basis for Carpenter's request is the sentencing judge's acknowledgment at sentencing that several letters had been received from friends and neighbors of the Ballards, including from two persons who lived in the Ballards' neighborhood and were also friends of the sentencing judge. The court explained that although it knew two of the people who had provided letters to the court, those letters were not given "any more weight" by the judge than the other letters. The sentencing judge also noted that these letters had been received in the same manner as the other letters from other members of the community and that the sentencing judge had not initially noticed that these particular letters had been written by friends. Carpenter did not object in the trial court.

We conclude that the mere fact that the sentencing judge knew two of the members of the neighborhood community who wrote letters, without more, does not suggest that "reassignment is

-34-

advisable to preserve the appearance of justice." *Hill*, 221 Mich App at 398. This fact, standing alone, does not warrant reassignment to a new judge under the *Hill* test. We are not persuaded that the trial court was unable to render a fair and just sentence because of its social relationship with two members of the community who were not parties to the case and wrote letters, nor are we persuaded that the trial court could not be fair and impartial on remand. To the extent the trial court must approach sentencing differently on remand due to our holdings in this opinion, there is no indication in the record that the trial judge will have any difficulty in "putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected." *Id*. Therefore, we deny Carpenter's request to have this matter reassigned to a different judge on remand.

## F. DEFENDANT PAGEL

Pagel also argues that the trial court erred by relying on acquitted conduct to determine his sentence, contrary to *Beck*. Pagel was convicted of first-degree home invasion, conspiracy to commit first-degree home invasion, and armed robbery. He was acquitted of felony murder, assault with intent to rob while armed, and all of the felony-firearm charges. At sentencing, the trial court determined that the guidelines range was 57 to 95 months each for the home invasion and conspiracy convictions and that the guidelines range for the armed robbery conviction was 135 to 225 months. The trial court departed from these ranges and sentenced Pagel to prison terms of 140 to 240 months each for the home invasion and conspiracy convictions and 300 to 700 months for the armed robbery conviction. All of the sentences were ordered to be served consecutively to each other.

In justifying its sentencing decision with respect to Pagel, the trial court made substantially similar comments to those quoted and discussed above, referring to the impact of "these crimes." The trial court also stated that Janice "had to watch her husband die in front of her." Additionally, after emphasizing that Janice had sold the home, the trial court stated to Pagel that Janice and Albert had planned on "growing old there together and you took that from them."

Thus, for the same reasons expressed above with respect to Eubanks and Carpenter, and considering that Pagel is substantially similarly situated to Eubanks and Carpenter in that he was convicted of some crimes and acquitted of others—particularly the felony murder charge—we grant Pagel the same relief and remand for the purposes of allowing the trial court to revisit its guidelines scoring and its ultimate sentencing decisions in light of *Beck*. The trial court shall also revisit its decision to impose consecutive sentences in light of *Norfleet I* for the same reasons expressed above regarding Eubanks and Carpenter.

Finally, we additionally conclude that Pagel has failed to show any entitlement to relief based on his assertion that the trial court failed to consider Pagel's youth in reaching its sentencing determination where Pagel was 17 years old at the time of his crimes. However, the trial court expressly recognized at sentencing Pagel's age and that he was the youngest codefendant. Pagel's trial counsel also specifically referenced that Pagel was 17 at the time of the crimes when he presented his sentencing argument to the trial court. Thus, the trial court was clearly aware of this factor as it imposed its sentence, and the trial court stated that it was familiar with all of the facts of the case and considered all of the evidence presented in reaching its sentencing decision. Pagel does not cite any legal authority for the proposition that a trial court must make any particular

finding or expressly consider any particular factors of youth in under the factual circumstances present at sentencing in this case. Pagel has not cited any legal authority that he alleges the trial court violated in this case with respect to Pagel's youth and his sentence.

Instead, Pagel only cites *Roper v Simmons*, 543 US 551, 578; 125 S Ct 1183; 161 L Ed 2d 1 (2005), in which the United States Supreme Court held that "The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." However, Pagel fails to develop any understandable argument how this case entitles him to relief. Pagel merely cites the Supreme Court's discussion about how juveniles are different than adults, a general proposition that we do not seriously dispute, and then leaves it up to this Court to explain why the trial court did not err by expressly considering all of those characteristics on the record. Pagel misunderstands the nature of appellate review. He has not cited any authority demonstrating that the trial court must follow the course that he proposes and he therefore has failed to show entitlement to relief. By simply announcing his position without adequately developing it, he has abandoned his argument. *Waclawski*, 286 Mich App at 679.

## IX.  CONCLUSION

We affirm defendants' convictions in all four appeals, but remand for further sentencing proceedings with respect to all four defendants consistent with this opinion.

Affirmed in part and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Stephen L. Borrello
/s/ Michelle M. Rick